# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| **JOHNSON MUTUAL FUNDS TRUST AND JOHNSON INVESTMENT COUNSEL, INC., Individually and on Behalf of All Others Similarly Situated,** | : <br> : **Civil Action No:** _____ <br> : <br> : **Judge:** _____ <br> : |
| **Plaintiffs,** <br> **vs.** | : **CLASS ACTION COMPLAINT FOR** <br> : **VIOLATIONS OF FEDERAL** <br> : **SECURITIES LAWS** |
| **TRANSOCEAN LTD. and STEVEN L. NEWMAN,** | : <br> : **JURY TRIAL DEMANDED** <br> : |
| **Defendants.** | : |

## INTRODUCTION

1.      This is a securities fraud class action on behalf of the purchasers of the publicly-traded common stock of Transocean Ltd. ("Transocean" or the "Company") from August 5, 2009 to June 1, 2010, inclusive (the "Class Period"), who were damaged thereby.  Throughout the Class Period, Defendants violated §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder by disseminating false and/or misleading statements and material omissions about, among other things, the Company's safety protocols, the nature and correction of design issues, recurring blowout preventer ("BOP") problems, and the Company's operating and safety record.

2.      Transocean promotes itself as "the world's largest offshore drilling contractor" and the leading international provider of drilling management services for oil and gas wells. During the Class Period, Transocean's common stock traded on the New York Stock Exchange ("NYSE") under the ticker symbol "RIG."  According to an article in the *New York Times*,

Transocean, which drills in some 30 countries and employs more than 18,000 people, owns nearly half of the 50 or so deepwater platforms in the world.[1]

3.      Transocean designed, owned, managed, operated and controlled the ultra-deepwater dynamic-positioned, semi-submersible mobile oil drilling rig called *Deepwater Horizon* (the "*Horizon*").  During the Class Period, Transocean leased the *Horizon* to BP, p.l.c., BP America, Inc., BP Products North America, Inc., BP America Production Company, and BP Exploration & Production Inc. (collectively, "BP").  Transocean has had a long relationship with BP, and for the last two years, BP has been Transocean's largest single customer, accounting for 12% of its $11.5 billion in operating revenue in 2009, according to Transocean's public filings.

4.      On or about January 30, 2010, the *Horizon* commenced a voyage in federal waters of the Gulf of Mexico in the vicinity of Mississippi Canyon Block 727 to the vicinity of Mississippi Canyon Block 252 for the purpose of conducting contract drilling operations. As part of its agreement with BP, Transocean operated the *Horizon* at the well at the "Macondo Prospect" which lies approximately 41 miles off the Louisiana coast and on the outer continental shelf in the Gulf of Mexico (the "Gulf").

5.      On April 20, 2010, the *Horizon* exploded – killing 11 crew members, 9 of whom were Transocean employees, injuring 17 others, and spilling massive amounts of oil into the Gulf.  At the time of the explosion, unknown to the public, drilling was being conducted at depths of 22,000 to 25,000 feet – in violation of the maximum allowed by the permits issued by the Minerals Management Service ("MMS") bureau of the U.S. Department of the Interior.

6.      The fire on the *Horizon* continued for 36 hours until, on April 22, 2010, the *Horizon* sank into the Gulf of Mexico and was declared a total loss by Transocean.  The failure

---

[1] *See New York Times* article entitled, "Owner of Exploded Rig is Known for Testing Rules," dated July 7, 2010.

of *Horizon*'s safety mechanisms, including the BOP, a key "failsafe" safety device for offshore wells, led to a massive oil spill that covered thousands of square miles – larger than that of the 1989 Exxon Valdez oil spill.  According to then BP Chief Executive Officer Tony Hayward, Transocean's BOP failed to operate before the explosion.  The resulting oil spill has caused serious and permanent environmental damage to the Louisiana coast, with detrimental effects upon the Gulf of Mexico's and Louisiana's marine environments, coastal environments and estuarine areas.  Moreover, Defendants' fraudulent misconduct has subjected the Company to significant liability, including investigations by the U.S. Departments of Justice, Homeland Security and the Interior and various committees and subcommittees of Congress.  The Company has also been subjected to over 100 civil lawsuits related to the catastrophic disaster.

7.    Before and during the Class Period, Defendants were made aware of, but did not publicly disclose, the safety implications and risks associated with the spills, fires and other serious incidents on the *Horizon*, which was issued citations for "acknowledged pollution source" by the U.S. Coast Guard some 18 times in the last 11 years.  Defendants also did not publicly disclose that the BOP on the *Horizon* was ten years old and had not been recalibrated, maintained, and/or tested appropriately, all of which violated federal regulations. In addition, Defendants were also made aware on several occasions of the serious safety hazards associated with Transocean's use of its BOPs on ultra-deepwater drilling engagements.   Instead of disclosing such material information during the Class Period, Defendants falsely represented that Transocean had addressed and remedied its past safety problems, falsely claiming that the Company's BOP problems "have all been resolved," that certain BOP issues were "anomalies," and that the Company was closely monitoring its operations and equipment, and was conducting its operations in a safe and sound manner.

8.       As a result of Defendants' violations of federal securities laws and materially false and misleading statements and/or omissions during the Class Period, Transocean's common stock traded at artificially inflated prices during the Class Period.  As the truth about the full extent of the disaster and the falsity of Defendants' previous statements and material omissions was absorbed by the market, members of the class were damaged when the price of Transocean shares fell from a Class Period high of $94.88 per share on January 11, 2010, to close at $50.04 on June 1, 2010.

## JURISDICTION AND VENUE

9.       The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

10.       This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

11.       Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b). Many of the acts in furtherance of the alleged fraud and/or the effects of the fraud occurred within this District, including the dissemination of materially false and/or misleading information and the omission of material information.  Further, the Transocean subsidiaries who were the owners and/or operators of the *Horizon* at the time of the explosion (Transocean Holdings LLC, Transocean Offshore Deepwater Drilling, Inc. and Transocean Deepwater Inc.) all maintain their principal offices in Houston, Texas.

12.       In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not

limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

13.     Plaintiff Johnson Mutual Funds Trust acquired Transocean publicly-traded common stock, as set forth in the attached Certification, and has been damaged thereby.

14.     Plaintiff Johnson Investment Counsel, Inc. acquired Transocean publicly-traded common stock on behalf of its clients, as set forth in the attached Certification, its clients were damaged thereby, and its clients have assigned their claims against Defendants to Johnson Investment Counsel, Inc. to pursue on their behalf.

15.     Defendant Transocean Ltd. started as a Louisiana company in 1919 under the name Danciger Oil & Refining Company. After many name changes, ownership changes, business combinations, Transocean is currently a Swiss company based in Vernier, Switzerland that has a U.S. office in Texas. Transocean's common stock is listed and trades in an efficient market on the NYSE under the symbol "RIG."

16.     Defendant Steven L. Newman ("Newman") served as the Chief Executive Officer ("CEO") of Transocean since March 1, 2010, a member of the Company's Board of Directors since May 14, 2010, and the President since May 2008. Newman also served as Chief Operating Officer ("COO") of the Company from May 2008 to November 2009 and resumed those duties from December 2009 until February 2010. Newman joined Transocean in its Corporate Planning Department in 1994, and served in several senior management positions from August 2003 through May 2008, when he became President. Newman received total compensation of $5.3 million in 2009 based on Transocean's purported success. When he was promoted to CEO on March 1, 2010, his base salary was increased to $900,000 and he became eligible for a 100%

bonus and long-term compensation of $5.4 million.  In written testimony before the Committee on Energy & Natural Resources of the U.S. Senate on May 11, 2010, Newman stated, "I am a petroleum engineer by training, I have spent considerable time working on drilling rigs, and I have worked at Transocean for more than 15 years."

17.     Newman, as one of the most senior officers of Transocean, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company and was privy to confidential information concerning the Company and its business, operations, products, safety protocols, the nature and correction of design issues for its products, recurring BOP problems, and the Company's operating and safety records, as alleged herein. Newman made and/or was involved in the drafting, reviewing and disseminating the false and misleading statements and information alleged herein.  As an officer and controlling person of a publicly held company whose common stock was registered with the Securities and Exchange Commission pursuant to the Exchange Act and traded on the NYSE, Newman had a duty to disseminate promptly accurate and truthful information with respect to the Company's financial condition, performance, growth, operations, products, safety protocols, operating and safety record, and other information that would be material to investors.  Defendants made, or caused to be made, false and misleading statements, or omitted to disclose material information concerning, among other things, (i) the Company's deficient safety efforts and safety violations; (ii) the heightened hazards associated with the BOPs used by the Company; (iii) the likelihood that the equipment required to drill at depths such as those encountered by the *Horizon* would render Transocean's safety protocols, including the BOPs, ineffective; and (iv) the Company's significant exposure to liability as a result of these unmitigated hazards, which caused the price of Transocean common stock to be artificially inflated during the Class Period.

# BACKGROUND

18.    Transocean presents itself as the world's largest offshore drilling contractor with operations around the globe.  Of the many different types of platforms for offshore drilling activities, from shallow-water steel jackets and jackup barges, to floating semi-submersibles and drillships able to operate in very deep waters, Transocean focuses on and offers deepwater and ultra-deepwater drilling. Transocean's fleet of drilling units consists of 45 High-Specification Floaters (Ultra-Deepwater, Deepwater and Harsh Environment semi-submersibles and drillships), 14 of which are located in the Gulf of Mexico.[2] The Company also provides oil and gas drilling management services and drilling engineering and drilling project management services, and participates in oil and gas exploration and production activities.

**Transocean's BOP Safety Features**

19.    As part of its mission statement, Transocean represents that it adheres to a "safety vision," stating in relevant part: "Our operations will be conducted in an incident-free workplace, all the time, everywhere."[3]

20.    To provide for safety, each Transocean drilling rig is designed to be equipped with safety mechanisms, including a BOP. A BOP is a five-story-tall, 900,000-pound concrete contraption that serves as a critical "failsafe" backstop for an offshore oil rig's valve at the top of a well that may be closed if the drilling crew loses control of formation fluids.  By closing this valve, the drilling crew can regain control of the well.  BOPs come in a variety of styles, sizes and pressure ratings.  Some can effectively close over an open wellbore, some are designed to

---

[2] As reported in the Company's April 22, 2010 statement, filed with the SEC on Form 8-K on April 23, 2010.
[3] *See* Transocean's Statement on Mission, Safety Vision, Core Values, available at http://www.deepwater.com/fw/main/Mission-Safety-Vision-Cove-Values-138.html (last accessed July 8, 2010).

seal around tubular components in the well (drillpipe, casing or tubing) and others are fitted with hardened steel shearing surfaces that can actually cut through drillpipe.

21.     Because BOPs are so critical to the safety of the crew, the rig, and the wellbore itself, BOPs are required to be inspected, tested and refurbished at regular intervals determined by a combination of risk assessment, local practice, well type, and legal requirements.  BOP tests vary from daily function testing on critical wells to monthly or less frequent testing on wells thought to have low probability of well control problems.  Despite certain representations by Defendants, such testing was not correctly performed on the *Horizon*, and the BOP on that rig failed at a critical moment, leading to the severe environmental and economic damage to the Gulf and significant financial losses to Transocean investors who purchased Transocean common stock at artificially inflated priced.

22.     While the oil industry, including Transocean, has always touted the BOP as a key to its ability to drill offshore without great risk to the environment, the industry's actions leading up to and following the Gulf oil spill disaster prove otherwise.  Senator Maria Cantwell of Washington, the chairwoman of two key Senate Commerce and Energy Committee subcommittees with oversight over offshore oil drilling, said following the devastating *Horizon* incident that the oil industry's portrayal of this kind of failure as unprecedented does not stand up to examination.  Cantwell stated: "There is clear evidence that the oil industry has been well aware for years of the risk that blowout preventers on offshore rigs could fail," indicating that her staff found extensive documentary evidence demonstrating the problems with BOPs. "Despite frequent failures, [the] industry assumed the preventers were fail-safe and, as a result, had no back-up plan for responding to a catastrophe like the one now unfolding in the Gulf," she noted.  Despite knowing these risks, Transocean represented to the public that BOP issues were

"anomalies," leading investors to believe BOP issues would not pose any significant risks to earnings.

23.      However, according to Stephen Stone, a Transocean employee who worked as a roustabout on the platform of the Horizon, safety policies were important at Transocean "if you have time... but if it's a rush, then you kind of overlook it."[4]

**Transocean's Deepwater *Horizon* Rig and the Gulf Drilling Operations**

24.      The *Horizon* was one of Transocean's specialized ultra-deepwater, dynamically positioned, column-stabilized, semi-submersible offshore drilling units, with a high-pressure mud pump and a water depth capability of 7,500 feet or greater.  It was built by Hyundai Heavy Industries in Ulsan, South Korea and has a replacement value of $560 million.  Construction started in December 1998 and the *Horizon* was delivered in February 2001. Since arriving in the Gulf of Mexico, the *Horizon* had been under contract to BP Exploration.[5]

25.      In 2002, the rig was upgraded with "e-drill," a drill monitoring system through which technicians based in Houston, Texas received real-time drilling data from the rig and transmitted maintenance and troubleshooting information.

26.      Even though the *Horizon* did have a BOP, its BOP did not have a remote-control shutoff switch known as an "acoustic switch," which allows a crew to shut down a damaged well by triggering an underwater valve.   Transocean uses acoustic switches on several of its rigs in locations such as Norway and Brazil, but did not have one on the *Horizon*.  The switch is used as a last resort if other attempts fail, since the primary shut-off systems do not usually work on

---

[4] As reported in the *New York Times* article on Transocean entitled, "A Behind-the-Scenes Firm in the Spotlight," published on May 24, 2010.
[5] On October 17, 2009, BP and Transocean agreed to extend the *Horizon* lease.  The three-year extension was set to begin in September 2010 and would pay $544 million, or $496,800 a day, over the three-year period.  By contrast, the current day rate is about $487,500.

wells when they are out of control.  It can be activated from a lifeboat if an oil platform must be evacuated.

27.     On September 3, 2009, BP announced what it characterized as a "giant" new oil discovery more than six miles deep in the Gulf of Mexico, but said it could take years to assess how much crude could actually be recovered.  Because of the depth of the find and the fact that the oil and gas in the field were extremely hot and under intense pressure, BP officials noted that the extraction would require advanced wellheads with thick steel and exceptional insulation.  Transocean's *Horizon* rig was contracted to drill this well.

**Safety Issues Leading Up to the Gulf Disaster**

28.     Contrary to the Company's purported safety vision and other representations, in practice, Transocean knew about but did not disclose problems associated with its BOP and did not properly inspect, test and maintain its BOP, leading it to fail at a critical moment.  Indeed, there were a number of safety issues leading up to the disaster reported in *60 Minutes* news story, told by Mike Williams ("Williams"), Transocean's chief electronics technician in charge of the *Horizon's* computers and electrical systems.  According to Williams, the BOP utilized on the *Horizon* had a damaged gasket.  Investigators found the BOP also had a hydraulic leak and a weak battery.  Although Transocean employees had adequate information to question the reliability of the BOP, managers recklessly ignored warning signs and proceeded with operations.

29.     Reported safety lapses included the hiring and premature dismissal of a top oilfield service company to test the strength of cement linings on the *Horizon's* well.  These service specialists were engaged to perform a final check, which normally takes 9 to 12 hours, called a "cement bond log."  A top cementing company executive has characterized the cement

bond log as "the only test that can really determine the actual effectiveness" of the well's seal. However, on April 20, 2010, the specialists were sent home 11 hours before the rig exploded even though a final check was not completed.

30.     In addition, investigators have also since discovered that the gas sensors and the shutoff systems that would have been connected to them, were not operating in the engine room of the *Horizon* rig.  As reported by *ProPublica*, in sworn testimony before a *Horizon* Joint Investigation panel in New Orleans in May 2010, *Horizon* mechanic Douglas Brown ("Brown") said that the backstop mechanism that should have prevented the engines from running wild apparently failed, and so did the air intake valves that were supposed to close if gas enters the engine room.  According to Brown, the influx of gas from the well gave the engines "a more volatile form of burning mixture," and caused them to rev out of control.  Another system was supposed to kick in and shut the engines down, but that system also failed.  Brown reported that the engine room was not equipped with a gas alarm system that could have shut off the power, even though such gas sensors are critical to preventing an explosion, because they can shut down a rig engine before an explosion occurs.

31.     According to Congressional investigations, in the days following the explosion, BP engineers tried to activate the BOP but failed because the device had been so altered that diagrams that BP received from Transocean did not match the device.  According to Rep. Bart Stupak, D-Mich., chairman of the House Energy and Commerce Committee's Subcommittee on Oversight and Investigations, "[a]n entire day's worth of precious time had been spent engaging rams that closed the wrong way," because the device had been modified.  Transocean and BP have accused each other of ordering the alterations, however, both were responsible for ensuring that the diagrams for the BOP device was up to date.

**Defendants Knew of the Inherent Dangers of Ultra Deepwater Drilling in the Gulf**

32.     The Company's internal reports reveal that Transocean has been aware of but has not fully disclosed to the public the problems associated with the BOPs used on its rigs due to the Company's long history of BOP-related problems pre-dating the Class Period and the April 2010 explosion on the *Horizon*.

33.     For example, in June 2000, BP issued a "notice of default" to Transocean over problems with a BOP on the Company's *Discover Enterprise* rig.  At the time, Transocean acknowledged that its BOP did "not work exactly right," and the *Discover Enterprise* was unable to operate for extended periods while the problem was purportedly resolved.  The *Discover Enterprise* BOP was made by Hydril, now owned by General Electric's oil and gas arm, and Cameron International, a Houston company.  Cameron also made the BOP on Transocean's *Horizon* rig, whose BOP was fitted in 2000 – approximately the same time BP issued this "notice of default."

34.     A 2003 Transocean internal report titled "Deepwater BOP Control Systems – A Look at Reliability Issues," co-authored by the then-director of technology development for Transocean, Earl Shanks, highlighted problems due to poor BOP reliability and warned that the industry was not taking the time necessary to find and fix the problems that commonly plagued BOPs.  According to the 2003 Report, the offshore exploration and production industry was so focused on drilling that it was willing to pay higher maintenance costs to keep rigs operating and avoid downtime rather than address some of the fundamental problems with the BOPs. "Floating drilling rig downtime due to poor BOP reliability is a common and very costly issue confronting all offshore drilling contractors," the 2003 Report noted, adding that each major disruption could cost $1 million.  The 2003 Report said the reliability issues were directly related

to the fact that drilling companies did not have detailed design and functional specifications to give BOP manufacturing companies. The BOPs were being rushed into the field with limited testing, and if one malfunctioned, the pressure to keep drilling meant it was fixed with little time spent trying to figure out what had caused the malfunction. According to the 2003 Report:

> Because of the pressure on getting the equipment back to work, root cause analysis of the failures is generally not performed. In many operations, high maintenance is accepted as a necessary evil to prevent downtime.
>
> High maintenance can be a tool to reduce failures in operation. However, this is a very expensive approach, and it is also an opportunity to introduce human error into the system. Also, this method does not establish reliability based on a failure rate.
>
> In general, operating reliability is maintained on rigs mostly through regular maintenance intervals rather than specifying a reliability of a system or component to minimize maintenance.

35.     On August 24, 2005, Great Britain's Health and Safety Executive ("HSE") issued a notice to Transocean for failing to ensure that a rig's BOP was properly maintained, citing that Transocean had not complied with regulations by failing to ensure that the Remote Blow Out Preventer control panel was maintained in an efficient working order and in good repair.

36.     Similarly, in June 2006, the HSE once again cited Transocean for problems and deficiencies related to Transocean's BOP testing, stating:

> The multi-purpose tool used in blow-out preventer pressure testing was not so constructed as to be suitable for the purpose for which it was provided, and failed in service, *exposing persons to risks that endangered their safety* on 29th April 2006. [Emphasis added.]

37.     In June 2008, a paper co-authored by Jeff S. Shepard, manager of Transocean's "Subject Matter Team," and titled "Ultradeep Drilling Pushes Drillstring Technology Innovations," was published in the Society of Petroleum Engineers *Drilling & Completion*. The paper highlighted BOP problems associated with deepwater drilling. Specifically, as a result of

the high-strength, high-toughness drillpipe used at such depths, it was found that BOPs were often unable to shear these pipes, a necessary step for effectiveness of a BOP.  The report provided in relevant part:

> **BOP Pipe Shearing**. The use of higher-strength, higher-toughness drillpipe of increased wall thickness required to absorb high tensile loading has in some cases exceeded the capacity of some BOP shear rams to successfully and/or reliably shear drillpipe. Several variables impact a BOP's ability to shear drillpipe, including:
>
> - Drillpipe outside diameter
> - Drillpipe wall thickness
> - Drillpipe material strength (ultimate and yield)
> - Drillpipe material toughness/ductility
> - Wellbore pressure (mud-hydrostatic head and trapped well-bore pressure equal to maximum BOP working pressure)
>
> To reduce the probability of drillstring failure, the industry has increased its appetite for high-toughness drillpipe. Increased material toughness/ductility provides resistance to crack propagation and often enables the material to sustain a through-wall crack without catastrophic failure, commonly known as "leak before break." . . .
>
> \* \* \*
>
> *Over the past few years, it has become clear that this successful improvement to drillpipe properties has not been achieved without consequence.*  Several publications have presented the effects of improved-drillpipe properties on BOP shearing capabilities. This has initiated multiple industry studies, including those performed by regulatory bodies. *A consistent finding throughout all of these studies is that drillpipe material ductility and toughness is one of the major influences to the amount of force/pressure required for shear rams to successfully and reliably shear drillpipe.*
>
> \*      \*      \*
>
> **Conclusions**
>
> 5. UDD presents increased operational considerations that require attention of the well designer. BOP shearing capacity of drill-pipe and BOP pressure integrity upon drillpipe collapse are adversely affected in UD wells. Well designers should work closely with OEMs to fully evaluate the performance limits of these products in ultradeep applications.
> [Emphasis added.]

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING
## STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

**Statements and/or Omissions Made by Transocean Prior to the Gulf Disaster**

38.     Throughout the Class Period, Defendants failed to disclose its safety violations, violations of applicable regulations and licenses, and the serious risks Transocean faced as a result of its ongoing utilization of deficient BOPs.  Defendants also failed to disclose that on numerous prior occasions, Transocean had been advised by its clients, or censured or otherwise disciplined by regulatory government entities, for BOP failures and problems, and that these problems were systemic, affecting all rigs that relied on BOPs as a last line of defense against catastrophic disasters.  Defendants had an affirmative duty to disclose these material issues and risks to investors, but did not do so.  When analysts questioned Defendants about safety issues, Defendants falsely represented that the issues were isolated, rather than systemic.

39.     On August 5, 2009, during the Company's second quarter 2009 earnings conference call, when asked specifically about the BOP problems that took place in the second quarter of 2009, Defendants made misstatements about their significance and likelihood of reoccurrence.  Defendant Newman, who was then President and COO, downplayed the risk they presented, making the following statements:

> *Arun Jayaram – Credit Suisse – Analyst:*  Yes, good morning. Bob, I was wondering if you could comment a little bit, at least in this quarter, about the deepwater revenue efficiency. The utilization, I guess, for all three segments was below my expectations. I was wondered if you can comment if there is any quarter-specific items that led to the lower unexpected utilization?
>
> \*          \*          \*
>
> [Steven Newman-Transocean Inc. - President & COO:] The deepwater segment of the fleet, which is the 4500 to 7500 foot segment, 16 rigs in that fleet was the largest underperformer in the second quarter. *We had a couple of human error incidents on drill floors on a couple of those rigs and we had a handful of BOP problems. Nothing that I would characterize as systemic or quarter-specific. We did a deep dive on each one of those incidents.  We have identified the root causes. We are going back to address them in our management system so they*

*don't happen again. It is uncharacteristic in the second quarter.* They were *anomalies,* and I think I would just leave it at that.

*Arun Jayaram – Credit Suisse – Analyst:* Steven, *any of those issues, could they impact Q3, these BOP issues that you're citing?*

[Newman:] *No, no, no. They have all been resolved and BOP operations are a complex part of our business. It is something we pay a lot of attention to. All of the BOP incidents that occurred in the second quarter have been resolved and we will continue to keep our eye closely on the performance of our subsea equipment.*

*       *       *

*Andreas Stubsrud – Pereto – Analyst:* Okay. I will try again. The deepwater category where you had the low utilization, was that a reflection of the old fleet?

*       *       *

[Newman:] Yes, there are some older rigs in that fleet, but it is not really a reflection of the age of the fleet. *The BOP problems we had were on [a] combination of modern generation and older systems. The human error -- the couple of human error issues we had were really completely unrelated to the age of the rigs those guys were working on.* So it doesn't have a lot to do with the age of the fleet.

[Emphasis added.]

40.     On February 24, 2010, Defendants held a conference call to discuss the Company's fourth quarter 2009 earnings results and operations. During the call, Defendant Newman made the following statements, reassuring investors that the Company had identified equipment failure issues, including the "BOP control issue," and had addressed them:

*Tom Curran – Wells Fargo Securities – Analyst:* Question. In terms of where utilization came in below what you would have expected based on scheduled downtime, *were there any issues remotely similar to those that occurred in the second quarter of 2009, where we had both technical problems related to BOPs as well as what was categorized as some human error problem?*

[Newman:] On the Ultra-Deepwater fleet, Tom, where we were particularly focused in the fourth quarter -- and that differs from where we were in the second quarter of last year, which was on the conventional Deepwater fleet. In the Ultra-Deepwater fleet, *we only had one BOP issue and one human error issue.*

We had a couple of start-up issues and we had some equipment failures. But the issues in the fourth quarter were largely dissimilar from what we saw in the second quarter of last year.

*Tom Curran – Wells Fargo Securities – Analyst: **So would it be fair to say then that both the nature and the number of those issues in Q4 was more in line with what you would consider normal, whereas second-quarter 2009 was clearly abnormal?***

[Newman:] ***Yes, I wouldn't characterize the fourth quarter of 2009 – I wouldn't characterize the performance on the Ultra-Deepwater fleet as normal, because it was below the historical revenue efficiency for that class. So I don't want to lead you to conclude that that is something we ought to expect going forward.***

***But we have identified the issue, the equipment failure issues. We have addressed the BOP control issue. And the human error issue is something we continue to focus on through our training and competency programs.***

[Emphasis added.]

41.    On or about April 1, 2010, Transocean issued its Proxy Statement for the Company's 2010 annual meeting of shareholders, and filed it with the SEC.   The Proxy Statement included a letter to shareholders from Defendant Newman, in which he stated:

Unfortunately, ***despite our continued focus on safety and operational excellence*** and our best-ever total recordable incident rate of 0.77 incidents per 200,000 hours worked, four of our employees suffered fatal accidents while working on our rigs in 2009. Our goal is to have an incident-free workplace all the time, everywhere.  To this end, ***we have embarked on a thorough review of our safety systems across our fleet to help us enhance procedures and processes that will assist us in achieving this goal.***  [Emphasis added.]

42.    In the Proxy Statement, the Company claimed that although its executives qualified for bonuses under the safety metrics in place, the executives were receiving no bonuses since the Company had "incurred four fatalities with varying causes in varying regions around the world." The Proxy asserted that:

The Committee took this extraordinary action to underscore the company's commitment to safety and to increase the incentive for executive officers to promote the goal of an incident-free workplace and, in particular, the avoidance of future fatal accidents.

43.     Transocean's executives were well compensated notwithstanding this decision to withhold bonuses, including Defendant Newman, who received total compensation of $5.3 million for 2009.

44.     In written and oral testimony on May 11, 2010, before the U.S. Senate Committee on Energy & Natural Resources, Defendant Newman said the explosion on the *Horizon* was caused by a failure of drilling cementing, casing or perhaps both.   And, he again falsely represented that the BOP had been adequately tested and was functional, and that Transocean never compromised on safety, stating in relevant part:

> To be sure, BOPs are an important aspect of well control.  During drilling, BOPs provide a secondary means of controlling pressure if the primary mechanisms (e.g., drilling mud) prove inadequate.   BOPs are robust, sophisticated pieces of equipment that can be activated by various direct and remote methods.   Since the BOPs were still in place in this circumstance, they may have been activated during this event and may have restricted the flow to some extent.   At this point, we can't be certain.   But we have no reason to believe that they were not operational – they were jointly tested by BP and Transocean personnel as specified on April 10 and 17 and found to be functional. . .
>
> . . . **Ours is an industry that must put safety first**.   And I can assure you that Transocean has never – and will never – compromise on safety.
>
> Despite a strong safety record, Transocean has never been complacent about safety.   We believe that any incident is one too many.

45.     The statements and material omissions made by Defendants during the Class Period were each materially false and misleading when made because Defendants failed to disclose the true material facts, including:

(a)     Transocean had recurring and undisclosed safety issues and safety violations throughout the Class Period.   In fact, as disclosed at the end of the Class Period, of the four fires aboard deep-water drilling rigs investigated by the MMS since 2005, all were operated by Transocean, including a fire that broke out on a brand-new Transocean rig, the *Discoverer Clear Leader*, which knocked out power to the thrusters that keep the rig in position above the

well – a dangerous situation, because if a rig drifts too far it can disconnect from the well and cause a spill. Additionally, in November 2005, Transocean's *Horizon* rig spilled over 200 barrels of an oil-based lubricant into the Gulf of Mexico due to equipment failure and human error.

(b)    Defendants had not resolved past BOP problems and BOP accidents and such occurrences were not "anomalies," as Defendant Newman claimed at the conference calls on August 5, 2009 and February 25, 2010.  In fact, during the preceding ten years, Transocean had been cited numerous times by both customers and governmental agencies for BOP failures and lax oversight.  For example, as revealed at the end of the Class Period, in 2006, when Transocean's *Discoverer Enterprise* was drilling for BP in over 6,000 feet of water and suffered a leak from the blowout preventer, causing 54 barrels of drilling fluid to spill into the Gulf, the MMS said the problem was caused in part by "extended use of [the BOP] without inspection/maintenance."

(c)    Defendants knew that BOPs operating on ultra-deep drilling rigs were inherently unsafe, yet failed to disclose that these "failsafe" mechanisms could not perform the critical "failsafe" function for which they were intended.  In fact, Defendants were aware, by virtue of the several industry papers on BOP failures, that the equipment necessary to successfully drill at depths similar to those encountered with the *Horizon* would interfere with the effective operation of Transocean's safety protocols, including the BOP.

(d)    Throughout the Class Period, Transocean did not have the necessary and proper safety protocols and equipment in place.  So, it was just a matter of time before an incident of catastrophic proportions, such as the *Horizon* disaster on April 20, 2010, would take place.  Indeed, Transocean knew that drilling was being done at the *Horizon* at depths deeper than permitted by the applicable permits and that drilling at significant depths required

specialized equipment that would render Transocean's safety protocols, including the BOP, ineffective.

**The Truth Begins To Be Revealed**

46.     Beginning on April 20, the public began to learn of Transocean's prior material misrepresentations and omissions, which caused Transocean's stock price to drop.   On the evening of April 20, 2010, at around 10 p.m., the semi-submersible *Horizon* experienced one or more explosions and a catastrophic fire.   The explosions and fire killed 11 people, 9 of whom were Transocean employees, and injured 17 others.   The day after the explosion, the Company stock price fell $1.66 per share, closing at $90.37 on April 21, 2010.

47.     On Thursday, April 22, 2010, the *Horizon* sank into the depths of the Gulf of Mexico and began leaking oil.   By that afternoon, a five-mile long oil slick extended from the accident site.   Unmanned submarines that arrived hours after the explosion were unable to activate the shut-off BOP valve on the seabed.   The Company's stock price continued to decline, closing at $89.89 on April 23, 2010.

48.     On April 29, 2010, the *Wall Street Journal* revealed in a report entitled "Oil Well Lacked Safeguard Device – Officials Say Leak Grows Fivefold" that the *Horizon* lacked a remote-control shut-off switch as last-resort protection against underwater spills, such as an acoustic switch.

49.     In response to this news, that contrary to the Company's representations of safety, it had failed to include adequate safety controls to protect against underwater spills, the price of Transocean shares plunged to close at $78.51 on April 29, 2010.

50.     The next day, on April 30, 2010, on the news that U.S. Attorney General Eric Holder was dispatching a team of lawyers to New Orleans to monitor the oil spill and that the

Obama administration would vigorously enforce environmental laws, the price of Transocean dropped another $6.19 to close at $72.32. "The Justice Department stands ready to make available every resource at our disposal to vigorously enforce the laws that protect the people who work and reside near the Gulf, the wildlife, the environment and the American taxpayers," Holder said in a statement.

51.     On May 5, 2010, Transocean filed its Form 10-Q for the quarter ended March 31, 2010 with the SEC.   In its Form 10-Q, the Company announced that the Departments of Homeland Security and the Interior, including the MMS, had begun a joint investigation into the Company and the cause of the incident.   In addition, it announced that various committees and subcommittees of the U. S. Congress had requested Transocean's participation in hearings related to the disaster, and the Company also received a request from the U. S. Department of Justice to preserve information related to the fire, explosion and sinking of the *Horizon*, as well as the subsequent oil spill.

52.     Transocean also announced that in connection with the *Horizon* incident, one of its subsidiaries was notified by the U.S. Coast Guard on April 28, 2010, that under the provisions of the Oil Pollution Act of 1990 ("OPA"), *Horizon* had been designated as a source of oil discharges and its subsidiaries had been designated as a responsibility party under OPA.

53.     In response to these revelations, shares of Transocean's common stock fell $3.06 per share from the prior day's closing, to close at $69.70 per share on heavy trading volume on May 6, 2010.

54.     On May 10, 2010, the extent of Defendants' deception began to surface in a news report published by *The Wall Street Journal* entitled "Rig Owner Had Rising Tally of Accidents."   The article set forth Transocean's spotty safety history, previously concealed from

the public, and noted that Transocean was involved in 73% of the incidents investigated by the

MMS from 2005 through 2007, even though it owned less than half the operating ultra-deep

drilling rigs in the Gulf.  The article revealed in relevant part:

> Nearly *three of every four incidents that triggered federal investigations into
> safety and other problems on deepwater drilling rigs in the Gulf of Mexico since
> 2008 have been on rigs operated by Transocean,* according to an analysis of
> federal data.    Transocean defended its safety record but didn't dispute the
> Journal's analysis.

> From 2005 through 2007, a Transocean rig was involved in 13 of the 39 deep-
> water drilling incidents investigated by the MMS in the Gulf of Mexico, or 33%.
> That's roughly in line with the percentage of deep-water rigs, 30%, Transocean
> owned and operated in the Gulf then, according to data firm RigLogix.

> Since the merger, *Transocean has accounted for 24 of the 33 incidents
> investigated by the MMS, or 73%, despite during that time owning fewer than
> half the Gulf of Mexico rigs operating in more than 3,000 feet of water.*

[Emphasis added.]

55.     As a result of these revelations, the price of Transocean common stock fell an

additional $1.67 on May 10, 2010, a day on which the S&P 500 had increased 4.3%.  Upon the

disclosures of previously omitted material facts related to Transocean's numerous safety

violations and investigations, the price of Transocean common stock fell $25.69 per share from

April 20, 2010 through May 10, 2010, a decline of almost 28%.

56.     On May 11, 2010, a U.S. Senate Committee hearing commenced to discuss the

Gulf disaster, entitled, "Economic and Environmental Impacts of the Recent Oil Spill in the Gulf

of Mexico."  Testimony during the Congressional hearings pointed to multiple technical failures

before the April explosion.  During the hearing, BP blamed the Gulf oil spill on the failure of

Transocean's BOP and raised questions as to whether Transocean disregarded "anomalous

pressure test readings" just hours before the explosion.  Halliburton, another party involved in

the disaster, also pointed the finger at Transocean, claiming that Halliburton had "faithfully"

followed instructions but that Transocean had improperly started replacing a heavy drilling mud with seawater before the well was sealed with a cement plug.

57.     On June 1, 2010, U.S. Attorney General Eric Holder confirmed that the Justice Department was investigating whether criminal or civil cases were warranted over the spill under several federal statutes.  Mr. Holder said: "We will make certain that those responsible clean up the mess they have made and restore or replace the natural resources lost or injured in this tragedy." He added, "And we will prosecute to the full extent any violations of the law."  The Obama Administration called the spill the "the greatest environmental disaster of its kind in our history," and had earlier said it was President Obama's "solemn pledge" to "bring those responsible to justice." Mr. Holder said his department was looking at laying charges under the Clean Water Act, Oil Pollution Act of 1990, the Migratory Bird Treaty Act and Endangered Species Acts, and other "traditional" criminal statutes. "There are a wide range of possible violations under these statutes, and we will closely examine the actions of those involved in this spill. If we find evidence of illegal behavior, we will be forceful in our response," he said.  The Obama administration already ordered all companies involved – including BP, Transocean and Halliburton – to preserve documents relating to the incident. Testimony in Congressional hearings has pointed to multiple technical failures before the explosion.

58.     Upon the news of these investigations and possible civil and criminal charges facing the Company, Transocean stock price fell further, to close at $50.04 on June 1, 2010.

59.     As a result of Defendants' materially false and misleading statements and/or omissions, Transocean common stock traded at inflated levels during the Class Period.  When the truth became apparent that Transocean's safety mechanisms and protocols – including the critical BOP – had failed and that Transocean had not only contributed to dozens of fatalities and

injuries, and been at the root of a multi-million gallon oil spill, but had also been the subject of numerous and recurring citations and investigations for poor operational and safety performance, the price of the Company's common stock declined from a Class Period high of $94.88 per share on January 11, 2010, to a closing price of $42.58 on June 9, 2010. This precipitous drop removed the artificial inflation from Transocean's share price, causing real economic loss to investors who had purchased Transocean common stock during the Class Period.

**Additional Scienter Allegations**

60.     On June 9, 2010, United Press International, Inc. reported that Transocean rig workers had repeatedly expressed concern over the "corporate culture" of "cutting staff and ignoring warning signs," adding that "an employee could be fired for raising safety concerns that could delay drilling." One rig worker explained that "safety was 'almost used as a crutch by the company'" and that "Transocean also would order a crane to operate in high winds, violating its own policies." Further confirming that Transocean's previous safety-related representations were false, the rig worker noted "'[i]t's like they used it against us – the safety policies – you know, to their advantage . . . . I don't think there was ever a plan set in place, because no one ever thought this was gonna ever happen.'".

61.     On July 7, 2010, the *New York Times* reported that Transocean had a history in a number of other countries for "testing local laws and regulations" – further contradicting its public statements during the Class Period touting strict adherence to safety procedures and regulations.

62.     On July 19, 2010, the *Wall Street Journal* reported that the *Horizon's* chief engineer, Stephen Bertone, revealed that the rig "had a series of blackouts, seized-up computers and other maintenance problems in the months before the drilling rig exploded." The *Wall Street*

*Journal* further reported that "investigators highlighted a September, 2009, BP audit of the Deepwater Horizon's maintenance practices that identified nearly 400 tasks that needed to be completed. A follow-up audit raised concerns about 'overdue planned maintenance' that was 'considered excessive.'"

63.     BP conducted an investigation of the *Horizon* disaster and released the results of its investigation on September 8, 2010. The report summarized how the accident occurred as follows:

> The accident on April 20, 2010, involved a well integrity failure, followed by a loss of hydrostatic control of the well. This was followed by a failure to control the flow from the well with the BOP equipment, which allowed the release and subsequent ignitions of hydrocarbons. Ultimately, the BOP emergency functions failed to seal the well after the initial explosions.

The BP investigation team, based upon a four-month investigation, found that:

- The cement and shoe track barriers – and in particular the cement slurry that was used – at the bottom of the Macondo well failed to contain hydrocarbons within the reservoir, as they were designed to do, and allowed gas and liquids to flow up the production casing. *"The investigation team concluded that there were weaknesses in cement design and testing, quality assurance and risk assessment."*

- Prior to temporarily abandoning the well, a negative-pressure test was conducted to verify the integrity of the mechanical barriers (the shoe track, production casing and casing hanger seal assembly). The results of the negative-pressure test were incorrectly accepted by Transocean and BP, although well integrity had not been established.

- Over a 40-minute period, the Transocean rig crew failed to recognize and act on the influx of hydrocarbons into the well until the hydrocarbons were in the riser and rapidly flowing to the surface.

- After the well-flow reached the rig it was routed to a mud-gas separator (MGS) rather than the overboard diverter line, which caused gas to be vented directly on to the rig rather than overboard. "The design of the MGS system allowed diversion of the riser contents to the MGS vessel although the well was in a high flow condition. This overwhelmed the MGS system."

- The rig's fire and gas system did not prevent hydrocarbon ignition.

- The BOP on the sea-bed should have activated automatically to seal the well, but it failed to operate, probably because critical components were not working. Three methods for operating the BOP in emergency mode were unsuccessful in sealing the well.

  - "The condition of critical components in the yellow and blue control pods on the BOP very likely prevented activation of another emergency method of well control, the automatic mode function (AMF), which was designed to seal the well without rig personnel intervention upon loss of hydraulic pressure, electric power and communications from the rig to the BOP control pods. An examination of the BOP control pods following the accident revealed that there was a fault in a critical solenoid valve in the yellow control pod and that the blue control pod AMF batteries had insufficient charge; these faults likely existed at the time of the accident."

  - *"Through review of rig audit findings and maintenance records, the investigation team found indications of potential weaknesses in the testing regime and maintenance management system for the BOP."*

64.     Commenting on the report, BP's outgoing chief executive Tony Hayward said:

The investigation report provides critical new information on the causes of this terrible accident. It is evident that a series of complex events, rather than a single mistake or failure, led to the tragedy. Multiple parties, including BP, Halliburton and Transocean, were involved.

To put it simply, there was a bad cement job and a failure of the shoe track barrier at the bottom of the well, which let hydrocarbons from the reservoir into the production casing. The negative pressure test was accepted when it should not have been, there were failures in well control procedures and in the blow-out preventer; and the rig's fire and gas system did not prevent ignition.

65.     As alleged herein, Defendants acted with scienter in that they knew or recklessly disregarded that the public documents and statements issued or disseminated on behalf of or in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially made and/or participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding Transocean, their issuance

of and/or control over Transocean's alleged materially misleading misstatements and omissions, and/or their associations with the Company that made them privy to confidential proprietary information concerning Transocean that contradicted or made misleading Transocean's public statements, participated in the fraudulent scheme alleged herein.

## CLASS ACTION ALLEGATIONS

66.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class comprised of all those who purchased the publicly-traded common stock of Transocean during the Class Period and suffered damages thereby (the "Class"). Excluded from the Class are: (i) Defendants; (ii) any person who was an officer or director of Transocean or any of its parents or subsidiaries during the Class Period and members of their immediate families; (iii) any entity in which any Defendant had a controlling interest during the Class Period; (iv) any parent or subsidiary of Transocean; and (v) the legal representatives, heirs, successors or assigns of any of the excluded persons or entities specified in this paragraph.

67.     The members of the Class are dispersed throughout the United States and are so numerous that joinder of all members is impracticable. According to Transocean's Form 10-Q filed with the Securities and Exchange Commission on May 5, 2010, Transocean had 319,933,046 shares of common stock issued and outstanding as of April 27, 2010. Transocean's common stock was actively traded on the NYSE during the Class Period. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Transocean and/or its transfer agent and may be notified of the pendency of this

action by mail, using the form of notice similar to that customarily used in securities class actions.

68.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class similarly suffered damages arising out of Defendants' wrongful conduct in violation of federal law that is complained of herein.

69.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

70.     Common questions of law and fact predominate and include whether Defendants: (i) violated the Exchange Act; (ii) omitted and/or misrepresented material facts; (iii) knew or recklessly disregarded that their statements were false; and (iv) artificially inflated the price of Transocean common stock and the extent of and appropriate measure of damages.

71.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## LOSS CAUSATION/ECONOMIC LOSS

72.     As detailed herein, during the Class Period, Defendants made materially false and misleading statements and/or omissions and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Transocean common stock and operated as a fraud or deceit on Class Period purchasers of Transocean common stock by misrepresenting the Company's risks, operations, safety record, business and prospects.  Later, when Defendants'

prior misrepresentations, omissions, and fraudulent conduct became apparent to the market, the price of Transocean common stock fell precipitously, as the prior artificial inflation came out of the prices over time. As a result of their purchases of Transocean common stock during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

**APPLICABILITY OF THE PRESUMPTION OF RELIANCE
AND FRAUD ON THE MARKET**

73.     The market for Transocean's common stock was open, well-developed and efficient at all relevant times. As a result of the materially false and misleading statements and omissions by Defendants, Transocean common stock traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased Transocean common stock in reliance upon the integrity of the market price of Transocean's common stock and market information relating to Transocean, and have been damaged thereby. At all relevant times, Defendants' material misrepresentations and omissions particularized in this Complaint directly or proximately caused the damages sustained by Plaintiffs and other members of the Class.

74.     Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     The omissions and misrepresentations were material;

(c)     The Company's common stock traded in an efficient market;

(d)     The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

(e)    Plaintiffs and other members of the Class purchased Transocean common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

75.    At all relevant times, the market for Transocean common stock was efficient for the following reasons, among others:

(a)    As a regulated issuer, Transocean filed periodic public reports with the SEC; and

(b)    Transocean regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

76.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false or misleading statements and material omissions pled in this Complaint.  Many of the statements alleged to be false and misleading were not specifically identified as "forward-looking statements" when made, and many were statements of historical fact and/or representations about the Company's then-existing condition to which the statutory safe harbor does not apply.

77.    To the extent any statements alleged to be false or misleading herein may be characterized as forward-looking to which the statutory safe harbor applies, (i) those statements were not accompanied by meaningful cautionary statements identifying the important then-present factors that could cause actual results to differ materially from those in the purportedly forward-looking statements; and (ii) the particular speakers of such statements knew in each case

that their statements were false or misleading and/or the statements were authorized and/or approved by an executive officer of the Company who knew that those statements were false or misleading, in each case when such statements were made.

**COUNT I**
**For Violation of § 10(b) of the Exchange Act and Rule 10b-5**
**Against All Defendants**

78.   Plaintiffs incorporate by reference all allegations set forth above.

79.   During the Class Period, Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to misrepresent and/or conceal adverse material information about the business, operations, risks, safety record, and prospects of Transocean, as described herein.

80.   During the Class Period, Defendants, and each of them, carried out a plan, scheme and course of conduct that was intended to and, through the Class Period did, (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein, (ii) artificially inflate and maintain the market price of Transocean's common stock; and (iii) cause Plaintiffs and other members of the Class to purchase Transocean's common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants took the actions described herein.

81.   Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts and/or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit

upon Plaintiffs and others purchasers in connection with their purchases of Transocean common stock during the Class Period.

82.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Transocean common stock during the Class Period.  Plaintiffs and the Class would not have purchased Transocean common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by the Defendants' misleading statements.

**COUNT II**
**For Violation of § 20(a) of the Exchange Act**
**Against Defendant Newman**

83.     Plaintiffs incorporate by reference all allegations set forth above.

84.     As set forth in Count I above, Defendants Transocean and Newman each violated § 10(b) of the Exchange Act and Rule 10b-5 by their acts and omissions alleged in this Complaint.

85.     Throughout the Class Period, Defendant Newman acted as a controlling person of Transocean within the meaning of § 20(a) of the Exchange Act.  By virtue of his most senior position with the Company, as President, Chief Operating Officer and eventually Chief Executive Officer, and his specific acts described above, Defendant Newman had the power to and did, directly or indirectly, exercise control over Transocean, including the content and dissemination of the various public statements about Transocean which Plaintiffs contend are false and/or misleading.  Newman had direct and supervisory responsibility for, and involvement in, the day-to-day operations of the Company and induced the Company to engage in the acts

constituting the violations of the federal securities laws alleged herein.  By reason of such conduct, Defendant Newman is liable pursuant to § 20(a) of the Exchange Act.

86.    By virtue of his position as a controlling person of Transocean, Defendant Newman is liable pursuant to § 20(a) of the Exchange Act to Plaintiffs and the members of the Class who have been damaged as a result of the Company's underlying securities law violations.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all other members of the Class, pray for judgment as follows:

A.    Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.    Awarding members of the Class compensatory damages and interest thereon;

C.    Awarding Plaintiffs' reasonable costs and expenses of this litigation, including attorneys' and experts' fees; and

D.    Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury in this action of all issues so triable.

Respectfully submitted,

THE LANIER LAW FIRM
/s/ W. Mark Lanier
W. Mark Lanier (TX Bar #11934600)
6810 FM 1960 West
Houston, TX 77069
Telephone:  (713) 659-5200
Facsimile:  (713) 659-2204
*Counsel for Plaintiffs*

WAITE, SCHNEIDER, BAYLESS & CHESLEY CO., L.P.A.
/s/ Stanley M. Chesley
Stanley M. Chesley (Ohio Bar # 0000852)
1513 Fourth & Vine Tower
One West Fourth Street
Cincinnati, Ohio 45202
Telephone: (513) 621-0267
Facsimile: (513) 621-0262
E-mail: stanchesley@wsbclaw.com
*Counsel for Plaintiffs*

OF COUNSEL:

Richard J. Arsenault (LA Bar #02563)
NEBLETT, BEARD & ARSENAULT
Post Office Box 1190
2220 Bonaventure Court
Alexandria, LA 71309-1190
Telephone:  (318) 487-9874
Facsimile:  (318) 561-2591

Daniel E. Becnel Jr. (LA Bar #24567)
Law Offices of Daniel E. Becnel, Jr.
106 W. Seventh Street
P. O. Drawer H
Reserve, LA 70084
Telephone:  (985) 536-1186
Facsimile:  (985) 536-6445

Jerrold S. Parker (NY Bar # 1894666)
Parker Waichman Alonso, LLP
6 Harbor Park Drive
Port Washington, NY 11050
Telephone:  (516) 466-6500
Facsimile:  (516) 466-6665

Camilo Salas, III (LA Bar #11657)
Salas & Co., L.C.
650 Poydras Street
Suite 1650
New Orleans, LA 70130
Telephone:  (504) 799-3080
Facsimile:  (504) 799-3085

Hunter J. Shkolnik (NY Bar # 4854)
Rheingold, Valet, Rheingold, Shkolnik & McCartney, LLP
113 East 37th Street
New York, New York 10016-3042
Telephone:  (212) 684-1880
Facsimile:  (212) 689-8156
34912